Filed 12/21/15  Alvarez v. W & L Harris Ranches CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| JOSE ALVAREZ,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>W & L HARRIS RANCHES, LLC.,<br><br>Defendant and Appellant. | C074421<br><br>(Super. Ct. No. 39201100256131CUWTSTK) |

In this disability discrimination case, a jury found that defendant W & L Harris Ranches, LLC (Harris Ranches) discharged plaintiff Jose Alvarez from his employment in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900, et seq.), and the jury awarded Alvarez $92,500 in damages for the violation.  The trial court subsequently awarded Alvarez $180,880 in prevailing party attorney fees under the FEHA.

On appeal, Harris Ranches contends the trial court erred in:  (1) admitting and excluding certain evidence; (2) exhibiting judicial bias in favor of Alvarez; (3) denying

1

Harris Ranches' new trial motion; and (4) making the attorney fee award. On cross-appeal, Alvarez also asserts error in the fee award. Finding no merit in any of the parties' arguments, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND[1]

Harris Ranches is a limited liability company, the members of which consisted of William Harris, his wife Lucille, and their children.[2] The Harrises also owned other business entities. In 2009, William Harris was the manager of Harris Ranches. Jerry Solari worked as the ranch foreman for Harris Ranches, managing a number of ranches that consisted mostly of almond orchards.

Alvarez, who speaks and understands limited English, began working for the Harrises in 1986. By 2008, he was employed by Harris Ranches. He worked as "[o]perator, mechanic, everything," but his primary role was to run the almond shaker during the almond harvest.

In March 2007, Alvarez suffered an on-the-job injury. He ultimately had surgery on his hand in May 2007 and was off work until August. He missed 81 days of work that year because of his injury.

Alvarez had another surgery in December 2007 and was off work again until May 2008. He also missed the 2008 almond harvest because he was incarcerated on a domestic violence conviction.

In June 2009, Alvarez suffered another on-the-job injury to his hand. Alvarez was off work as a result of the injury from June 23 until August 3. On August 4, the day after he returned to work, Alvarez was working on the shaker when William Harris arrived and

---

[1] What follows is a brief summary of the most pertinent underlying facts, viewed in the light most favorable to the jury's verdict, and the basic procedural facts. Further facts are provided, as necessary, in connection with each argument we address.

[2] William Harris died in 2012, during the pendency of this action.

2

said he wanted to talk to Alvarez and Solari. According to Alvarez, William Harris "looked angry and the more he said, the angrier he became. So then he just kept throwing bullshit and words that sounded bad. Then he kept saying 'easy money, easy money.' So then when he was really mad, he said there's no more work." Alvarez understood that by saying this, William Harris had fired him.

In January 2011, Alvarez commenced this action by filing a complaint for damages alleging disability discrimination (among other causes of action that are not relevant for our purposes). A jury trial was held over 11 days between May 8 and May 25, 2013. At trial, Harris Ranches offered evidence that William Harris had not fired Alvarez, and that William Harris had met with Alvarez on August 4, 2009, only to find out what Alvarez's intentions were because of the time Alvarez had missed on the previous harvests. Despite that evidence, the jury found for Alvarez on his cause of action for disability discrimination and awarded him $92,500 in damages. Harris Ranches moved for a new trial, and Alvarez moved for an award of attorney fees. The trial court denied the new trial motion on July 15, 2013, and Harris Ranches timely appealed.

On August 23, the trial court granted the fee motion, awarding Alvarez $205,080 in fees. Harris Ranches moved for reconsideration of the award and also timely appealed the award. On November 1, the trial court ruled on the motion for reconsideration and reduced the fee award to $180,880. On November 25, Alvarez filed a notice of cross-appeal from the original ruling on the fee motion and the ruling on the motion for reconsideration.

DISCUSSION

I

*Exclusion Of Evidence That Alvarez Was In Jail For Domestic Violence*

Before trial, Alvarez filed a motion in limine to "exclud[e] from evidence any reference to his criminal history; exclusive of his 2008 incarceration." In his motion,

3

Alvarez specifically stated that he was not "request[ing] the exclusion from evidence of his 2008 incarceration because it caused him to miss the harvest season." In other words, Alvarez appeared to concede that evidence that he was in jail in the fall of 2008 would be admissible to show why he did not work for Harris Ranches during the harvest season that year.

In opposing Alvarez's motion, Harris Ranches argued that Alvarez had a "very spotty work history . . . due in part to several different jail sentences that he was required to serve," and the jury "need[ed] to know why William Harris was concerned that Jose Alvarez might not be available for working in the Fall [of] 2009."

In arguing the motion before the trial court, Alvarez's attorney began by suggesting, contrary to the written motion in limine, that Alvarez's 2008 incarceration should *not* come into evidence, but he then argued that even if it *did* come in, the evidence should be limited to the fact that he was incarcerated, without any reference to the nature of the conviction or the facts surrounding it.

Harris Ranches' attorney argued that there had been "an unbroken pattern of accommodating and trying to keep [Alvarez] working," despite the fact that he missed the 2007 harvest season due to an injury and the 2008 harvest season due to incarceration, and counsel suggested that Alvarez's criminal history was relevant to assist the jury in "evaluating the Harris conduct of going consistently month in, month out, year in, year out, going the extra mile to do whatever they needed to do to keep [Alvarez] working." According to Harris Ranches' attorney, "the jury can't understand the context of why Mr. Harris was doing things unless they understand how he tolerated, accepted, and did not have a problem with or hold[] it against [Alvarez] in any way because of [his] past absences."

The court asked "[w]hy would it not be as probative to simply indicate that the plaintiff was absent for personal reasons unrelated to work or his health, during the 2008 harvest season? And 2007, it was due to his health?"

Harris Ranches' attorney contended that would be "an inviting argument . . . without due regard for all of the history," which was that Alvarez "was a very volatile person" who "had a very short fuse." In counsel's view, it was important to show that William Harris knew of Alvarez's "explosive character" and was asking Alvarez at the August 4, 2009 meeting if Alvarez was "going to behave [him]self now in the fall and not get in more trouble so [he wouldn't] be available" for the 2009 harvest season.

The court responded that its concern was "under [Evidence Code section] 352, the magic words are 'unduly prejudicial.' As soon as those two words, 'domestic violence' get inserted into a reasoning, you've just lost certain members of the jury" because "[o]ur society today is highly sensitized to these domestic violence issues."

In response, Harris Ranches' attorney argued that "if you leave out that inflammatory part, you also leave out the intensity of motivation of why [William Harris] would go there" -- i.e., why he would seek assurance from Alvarez that Alvarez was going to be available for the 2009 harvest. He argued that Alvarez's criminal history was necessary to determine whether William Harris was "motivated by discriminatory wrongful purpose or . . . by a desire to meet his responsibilities as a managing member of an LLC that had 200 acres of walnuts."

The court ruled that Harris Ranches could "put on [its] full defense by simply indicating that [Alvarez] was absent for personal reasons unrelated to work, but he was still accommodated by [Harris Ranches]" and could "put on evidence that he was not there, possibly because he had a temper," but "[d]omestic violence is off limits" and "[g]oing to jail for domestic violence is off limits."

On appeal, Harris Ranches contends the trial court erred in forbidding any reference to Alvarez being in jail in the fall of 2008. We find no merit in that contention.

Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger

5

of undue prejudice, of confusing the issues, or of misleading the jury." "Reasonable exercise of trial court discretion pursuant to Evidence Code section 352 requires that the trial judge balance the probative value of the offered evidence against its potential of prejudice, undue consumption of time, and confusion. [Citation.] That balancing process requires consideration of the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relevant to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in section 352 for exclusion. [Citation.] The more substantial the probative value of the evidence, the greater the danger of the presence of one of the excluding factors that must be present to support an exercise of trial court discretion excluding the evidence." (*Kessler v. Gray* (1978) 77 Cal.App.3d 284, 291.)

Employing the foregoing principles, we find no abuse of discretion in the trial court's ruling. First, to the extent Harris Ranches suggests it was imperative for the jury to know that Alvarez missed the 2008 harvest due to his incarceration because William Harris's purpose in questioning Alvarez at the August 4, 2009, meeting was "to receive a commitment from Alvarez [that he would] not do something to get thrown in jail," we agree with Alvarez that there is no evidence in the record "that this was [William] Harris'[s] motive." In its reply brief, Harris Ranches cites, in its entirety, William Harris's deposition testimony in support of his supposed purpose; however, as Alvarez points out, "[n]*one* of this testimony expressed any worries that Alvarez was . . . about to engage in further domestic violence or any other criminal activity which would result in re-incarceration."[3] Instead, it appears from the transcript that William Harris's primary

---

[3] We note that the deposition transcript that was made part of the record was significantly redacted, but we cannot determine whether there may have been support for Harris Ranches' position in the redacted portions because Harris Ranches failed to make an *unredacted* version of the transcript part of the record.

concern was determining whether Alvarez "wanted to work for [Harris Ranches] or whether he wanted to go on disability." Harris Ranches points to no evidence that William Harris was actually concerned that Alvarez would do something that might put him in jail again. Accordingly, to the extent Harris Ranches contends the trial court failed to properly assess the probative value of the evidence of incarceration, we are not persuaded.

Second, to the extent Harris Ranches asserts "there is no reason, other than speculation, to believe the evidence would have been prejudicial and uniquely tended to evoke an emotional bias" against Alvarez, we again disagree. It was for the trial court to determine whether the jury might be unduly prejudiced against Alvarez by learning that he missed the 2008 harvest because he was in jail, and the trial court's determination on that point was plainly not beyond the bounds of reason. (See *People v. Stewart* (1985) 171 Cal.App.3d 59, 65 [a "trial court's ruling under [Evidence Code] section 352 will be upset only if there is a clear showing of an abuse of discretion" and "discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered"].)

Finally, to the extent Harris Ranches asserts "[t]he required balancing process [under Evidence Code section 352] did not take place" because "[t]he Court looked to just one side of the question," we disagree because "[a] trial court ' "need not expressly weigh prejudice against probative value--or even expressly state that [it] has done so . . . ." ' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 178.) Here, the trial court implicitly determined that whatever probative value there might have been to evidence that Alvarez was incarcerated during the 2008 harvest was substantially outweighed by the potentially undue prejudicial effect of that evidence. Thus, the required balancing did occur.

## II

### *Exclusion Of Evidence Of Alvarez's Immigration Status*

On the first day of trial, Alvarez moved to "exclud[e] all evidence of his residency status and possible deportation" on the grounds that his immigration status was irrelevant and also should be excluded under Evidence Code section 352. In response, Harris Ranches indicated that it wanted to offer evidence "[t]hat on more than one occasion William Harris wrote letters to the United States Immigration Service [*sic*] confirming employment of Jose Alvarez and confirming that there would be continued employment and that he had been a good employee."

At the hearing on Alvarez's motion, Harris Ranches' attorney produced two letters and offered to redact a sentence from each of them "about being allowed to be in the United States."[4] Counsel then argued the letters were "relevant, not because of anything to do with immigration, but because they illustrate the pattern of Mr. Harris trying to support Mr. Alvarez, trying to do whatever he can to maintain an employment relationship with him."

The court ruled that it was "going to allow the use of the letters." Harris Ranches' attorney asked if the court was going to leave in the sentences about Alvarez being allowed to be in the United States, and upon the request of Alvarez's attorney to redact those sentences, the court agreed to do so. Following further discussion, the court clarified that the parties could "talk about immigration queries, issues, matters, but no[t] deportation."

During his examination of Lucille Harris, Alvarez's attorney asked her whether "Harris Ranches supported Mr. Alvarez during this time," apparently referring to the time

---

[4] Each letter contained the following sentence: "Any assistance that you can provide to Mr. Alvarez-Cardenas to allow him to remain in the USA will be greatly appreciated."

during which Alvarez missed the 2008 harvest. Lucille Harris asked Alvarez's attorney, "Do you mean he lived in our home? We gave him a home. Please clarify your question for me." Instead of doing so, Alvarez's counsel introduced the first of the two redacted letters of support, dated October 3, 2008, and questioned her about it. When counsel asked Lucille Harris, with reference to the letter, to confirm that William Harris "was supporting Mr. Alvarez, despite his hard times," Lucille Harris asked, "Despite whose hard times?" When counsel clarified that he was talking about Alvarez's hard times, Lucille Harris asked, "What are his hard times?" The following exchange then occurred:

"THE COURT: Are we referring to the personal leave?

"[Alvarez's Attorney]: Yes, we are, Your Honor. I don't want to go too far into that because the Court's already made a ruling in that regard.

"THE COURT: I think he's referring to 2008. With that clarification, can you answer[?]

"[Alvarez's Attorney]: Q. You've testified that Mr. Alvarez had some personal problems in 2008 and that caused him to miss the harvest, correct?

"A. Severe personal problems, yes.

"Q. And despite those several personal problems, Mr. Harris wrote this letter of support for Mr. Alvarez, correct?

"A. Because of his personal problems.

"THE COURT: Ma'am, if you could answer the question yes or no, please do so. Then if the answer would be misleading without an explanation, you'll be allowed to explain.

"THE WITNESS: Right."

Thereafter, Alvarez's counsel showed Lucille Harris the second letter, dated February 20, 2009, and there was an unreported discussion at the bench. Alvarez's counsel then elicited from Lucille Harris that William Harris had written this second letter of support for Alvarez "because of his severe personal problems." The second

9

letter was then admitted into evidence, with the court noting that it was being received "subject to [Harris Ranches' attorney's] objections," which he would have the opportunity to make a record of at the next break.

Subsequently, Harris Ranches' attorney filed a motion requesting that the court reconsider its ruling on evidence of Alvarez's immigration status. Counsel argued that during his examination of Lucille Harris, Alvarez's attorney had "in effect . . . sponsor[ed] the idea that the letters were letters of financial support and memorialized the financial support that the Harrises were giving to Jose Alvarez." According to Harris Ranches' attorney, "[t]he presentation clearly created a false picture to the jury," and he requested permission to "introduce the true exhibits to the jury" to correct that false picture. The trial court summarily denied that motion, asserting "[t]here's no new facts or law" and "how [the letters were] used at trial" was "not a new fact."

On appeal, Harris Ranches contends the trial court erred in granting Alvarez's motion to preclude mention of his immigration status and in failing to grant Harris's motion to reconsider that ruling. We disagree.

First, to the extent Harris Ranches can be understood to complain about the court's initial ruling, Harris Ranches cannot do so because -- initially at least -- Harris Ranches got exactly what it asked for in response to Alvarez's motion: the right to offer the two letters into evidence, with the sentences pertaining to Alvarez remaining in the country redacted. Harris Ranches cannot complain that the court ruled on Alvarez's motion exactly as Harris Ranches requested.

Second, to the extent Harris Ranches complains about the trial court's refusal to reconsider the redaction following Lucille Harris's testimony about the letters, Harris Ranches may not be precluded from making *that* complaint, but the complaint is without merit. Harris Ranches contends that the effect of Lucille Harris's testimony about the letters "was to communicate to the jury that Alvarez had left with the permission of Harris [Ranches] which was false; that he was absent because of unavoidable personal

10

problems for which he was not responsible and Harris [Ranches] approved of this situation, which it did not, all of which was simply not true." But we find no reasonable possibility that the jury would have, or could have, understood the letters, or Lucille Harris's testimony about them, in the manner Harris Ranches contends. The letters, which are identical, simply confirm that Alvarez was employed full time by Harris Ranches, that he was "a loyal, very reliable, dedicated and hard working employee," that he had not "caused any trouble to this company," and that he was assured "a job in this company for as long as he so desires." It was this "support" that the letters provided and to which Lucille Harris testified. Contrary to Harris Ranches' arguments, no "deception was presented to the jury by court order" just because the references in the letters to Alvarez "remain[ing] in the USA" were redacted, even with the testimony Lucille Harris gave. Accordingly, Harris Ranches has shown no error in the trial court's denial of its motion for reconsideration.

III

*Admission Of Evidence Relating To Alvarez's 2007 On-The-Job Injury*

Alvarez called Solari as his first witness. Eventually, Alvarez began questioning Solari about an on-the-job injury Alvarez suffered in March 2007. After many questions relating to that injury, the court asked for an offer of proof as to where the line of questioning was going. Alvarez's attorney explained that he intended to show that Harris Ranches never accommodated Alvarez with respect to that injury, which he contended was "very relevant to establish the intent and everything that was going on at this time." The court responded, "I think the topic may be valid but the way the examination is going, I'm not sure what it's going to prove." Alvarez's attorney then agreed to restate the pending question, and examination of Solari on the subject proceeded. Harris Ranches' attorney eventually interjected with an objection that "[t]his whole area is simply not relevant," but the court overruled the objection.

11

Later, when Alvarez's attorney gave Harris Ranches' attorney two proposed exhibits relating to the 2007 injury, Harris Ranches' attorney asked for an order precluding Alvarez's attorney from going into the matter further or for an offer of proof. Alvarez's attorney argued that he "need[ed] to walk through the 2007 injury and the efforts to accommodate, or lack thereof, for that injury to establish that the company did not accommodate injuries and to establish the animus that led to the discriminatory termination and wrongful termination." Harris Ranches' attorney asked why the failure to accommodate an injury in 2007 would "have any relevance to the matter before the Court." The court responded "[s]ame employee," and Alvarez's attorney added, "Yes, same employee, same practice and procedure." The court then said, "Counsel, I don't understand your objection. I'm going to overrule it."

Subsequently, the court noted a standing objection from Harris Ranches' attorney "to the entire 2007 year."

On appeal, Harris Ranches contends the trial court erred in permitting the introduction of evidence regarding the 2007 on-the-job injury. We disagree.

Evidence of an employer's other acts of unlawful discrimination may be relevant to prove the employer's intent and motive and to cast doubt on the employer's stated, nondiscriminatory reason for an adverse employment action. (E.g., *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 112-114.) Here, Alvarez offered evidence of Harris Ranches' "failure to attempt any reasonable accommodation" of his work restrictions in 2007, when he suffered an earlier, on-the-job injury, "to prove discriminatory intent when it failed to accommodate [his] work restrictions in July and August 2009 immediately prior to his discharge."

Harris Ranches contends that because there was no evidence Alvarez ever advised anyone in 2007 that he was in pain, there was no way Harris Ranches could have accommodated him in 2007. The evidence showed, however, that: (1) the ranch manager, Solari, was aware that Alvarez injured his left hand on the job on March 8,

12

2007; (2) the office manager, Alma Guerra-Ortiz, was aware of Alvarez's initial discharge instructions from the same day, which authorized Alvarez to return to work the following day with limited left hand use; but (3) Solari did not speak with Guerra-Ortiz about Alvarez's work restrictions and the day after the injury Solari assigned Alvarez to cut up scrap metal with a torch, which involved using his left hand, which he described as being "in very bad shape." Given this evidence, the fact that Alvarez may have never complained of pain is immaterial. The evidence showed that Harris Ranches, through one of its employees, knew of Alvarez's work restrictions, but Harris Ranches, through another of its employees, failed to accommodate those work restrictions. Under these circumstances, it was not an abuse of discretion for the trial court to admit evidence relating to the 2007 injury on the theory that it had a tendency to show that Harris Ranches had a practice of not honoring work restrictions relating to Alvarez's on-the-job injuries.

As for Harris Ranches' complaint that "nothing whatsoever was mentioned, let alone alleged, about the 2007 injury in the complaint," Harris fails to offer any authority that required Alvarez to do so.

For the foregoing reasons, Harris Ranches has failed to show any error in the court's admission of evidence relating to Alvarez's 2007 on-the-job injury.

IV

*Exclusion Of Statements By William Harris*

Harris Ranches asserts that "[a]t trial, the Trial Court refused to permit Lucille Harris to testify about the then existing state of mind of William Harris and also what the position was of the Harris Ranches LLC." Harris Ranches further asserts that "[t]he trial court also prevented all other Harris witness members from testifying concerning any meeting or course of action by William Harris." Finally, Harris Ranches asserts that "[a]n offer of proof was made as to what action was undertaken on August 4, 2009, by William Harris, and why," but "[t]he trial court sustained a hearsay objection." The only

13

reference to the record in all of this, however, is to a single page of the reporter's transcript.

Review of that page of the reporter's transcript, and the preceding and following pages, reveals the following: The attorneys and the court were discussing the witnesses Harris Ranches intended to call. Harris Ranches' attorney stated that he intended to lead off with Harris Ranches' president, Marty Harris, and that Marty Harris would testify "that he had a conference with his father [William Harris] on the morning of August 4th, that the concerns relative to Jose Alvarez were discussed at that point, that he saw [William Harris] the next morning, and discussed the events of the day before." Alvarez's attorney complained that Marty Harris had not been identified in discovery as someone having knowledge of the events that led to the cessation of Alvarez's employment. The court indicated that if Marty Harris "was not identified on the witness list as a person having knowledge of the events surrounding the termination, then he's not going to testify here." Harris Ranches' attorney said, "He didn't have personal knowledge of those events. He had knowledge of conversations with Bill Harris." The court responded, "Well, then it would be hearsay," and Alvarez's attorney "object[ed] as to what Bill's telling him as hearsay and particularly unreliable." Harris Ranches' attorney replied, "It is a party opponent." The court then said, "As a party opponent, certainly hearsay statements can be brought in, but if Mr. Harris, Junior was there at the time conversing with his father about the events surrounding the termination, alleged termination and he was not identified on the witness list, then I don't see any reason to let him testify to those events now." Harris's attorney tried again, asserting, "Well, he's not testifying to those events. He's testifying about conversations with Mr. Harris." The court "sustain[ed] the objection."

While it may not have been entirely clear at that point the basis of the objection the court was sustaining, upon further argument from Harris Ranches' counsel the court made it clear that it was prohibiting Marty Harris from testifying to conversations he had

14

with William Harris on August 4 and 5 because the subject of those conversations involved the events surrounding Alvarez's termination. Thus, the court was sustaining Alvarez's objection to Marty Harris's testimony on the ground that Marty Harris had not been identified in discovery as a person with knowledge of the events that led to the cessation of Alvarez's employment.

As to this ruling -- which is the only one Harris comes even close to properly identifying with a citation to the record -- Harris Ranches' assertion of error on appeal is without merit for at least two reasons. First, "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless . . . it appears of record that: [¶] (a) [t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354.) Here, Harris Ranches fails to show us that it made the *substance* of Marty Harris's intended testimony regarding his conversations with his father on August 4 and 5 known to the trial court by any means. In other words, so far as we know, Harris never made an offer of proof to the trial court as to the substance of the conversations Marty Harris had with William Harris. Without such a showing, the trial court's ruling excluding Marty Harris's testimony regarding those conversations cannot provide the basis for any relief to Harris Ranches.

Second, because it appears from our review of the pages immediately surrounding the single page cited by Harris Ranches that the basis of the trial court's ruling was not Alvarez's hearsay objection, as Harris contends, but rather his objection that Marty Harris was not properly identified in discovery, to show error in the court's ruling Harris Ranches would have to address the latter issue rather than the former. At no point in its argument, however, does Harris Ranches address the actual basis for the trial court's ruling. Accordingly, for that reason, too, Harris Ranches has failed to show any error in the trial court's ruling regarding Marty Harris's testimony.

15

V

*Alleged Judicial Bias*

Harris Ranches contends the trial court committed judicial error by "exceed[ing] the bounds of neutrality" and failed to follow the Code of Judicial Conduct by "creat[ing] the appearance of bias and one sidedness," for which "there should be a reversal and new trial." We disagree.

At the outset, we must emphasize one of the fundamental requirements for an appellate brief: A brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(1)(C).) "If a party fails to . . . support an argument with the necessary citations to the record, we may deem the argument waived." (*Utility Consumers' Action Network v. Public Utilities Com.* (2010) 187 Cal.App.4th 688, 697; see also *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294 ["we will generally consider only those facts and arguments supported by adequate citations to the record"].)

Here, Harris Ranches purports to identify various incidents during the trial in which the trial court allegedly demonstrated bias in favor of Alvarez. In most cases, however, Harris Ranches fails to provide any citation to the record, or the citation Harris Ranches provides does not support its description of events.[5] "We are not required to independently search this extensive record to verify the factual or procedural points cited by the parties." (*Utility Consumers' Action Network v. Public Utilities Com.*, *supra*, 187 Cal.App.4th at p. 693.) Accordingly, we proceed to address this argument only with

---

[5]     As just one example, Harris Ranches contends that when Alvarez "broke down in tears" on the witness stand, the court offered him a box of tissues, but when Lucille Harris "began crying on the stand," the court failed to offer her a tissue. The only citation Harris Ranches provides to the record, however, does not support *any part* of Harris Ranches' factual assertions.

16

respect to those incidents as to which Harris Ranches has provided an accurate citation to the record.

Harris Ranches identifies the following comments offered by the trial court during the course of the trial, mostly directed at the performance of Harris Ranches' counsel:

(1) "Let me see, does the jury know the answer to this question? I think they know the answer to that, counsel. It's been asked and answered several times."

(2) "Counsel, I don't think I've ever seen examination of a witness in this fashion. I'll simply say that."

(3) "[W]e're going to move on. This trial is dragging and it's because of objections that are without foundation and questions that are pointless. Now let's get to the meat of this case."

(4) "It's frustrating to the jury, counsel. They're laughing and rolling their eyes during your examination. Maybe you should look at the jury once in a while."

(5) "Yes, they deserve to be made fun of, Counsel, they were somewhat ridiculous."[6]

(6) "That's right, counsel. Because the questions have been asked multiple times and they're not drawing an objection [from] the other side. The objections I am getting from the other side are frequently without foundation."

Harris Ranches contends the foregoing statements, which were "critical of the defense and how the defense presented its case," amounted to impermissible judicial bias in favor of Alvarez, for which "there should be a reversal and a new trial." We disagree.

We first note that the comments set forth above were not solely directed at Harris Ranches' counsel. The court's reference to "objections that are without foundation"

---

[6] The trial court made this comment in reference to "some of the questions," without clearly indicating whether the court was referring to questions by both attorneys or only those by Harris Ranches' attorney.

17

appears to have been a criticism of Alvarez's counsel, as the court later referred, while addressing Harris Ranches' counsel, to "objections . . . from the other side [that] are frequently without foundation." Thus, while Harris Ranches' counsel undoubtedly received more criticism than Alvarez's counsel -- at least in the comments Harris Ranches has brought to our attention -- the court's criticisms were not limited to Harris Ranches' counsel.

That said, we agree with Harris Ranches that the court's comments, as directed at *both* attorneys, were inappropriate. "Judicial ethics require a judge to 'be patient, dignified, and courteous to litigants . . . [and] . . . lawyers.' " (*Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1003.) "In conducting trials, judges ' "should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other." [Citation.]' [Citation.] Their conduct must ' " ' "accord with recognized principles of judicial decorum consistent with the presentation of a case in an atmosphere of fairness and impartiality." ' " ' [Citation.] ' "The trial of a case should not only be fair in fact, . . . it should also appear to be fair." ' " (*Id.* at p. 1002.) Where "the trial judge's conduct was sufficiently egregious and pervasive that a reasonable person could doubt whether the trial was fair and impartial," reversal is appropriate. (*Id.* at p. 997.)

Here, it is certainly true that the trial court was not always "patient, dignified, and courteous" to the lawyers. It is also true that, at least with respect to the comments identified above, Harris Ranches' attorney got the worst of it. Nevertheless, Harris Ranches has not shown that the court's conduct was so egregious and pervasive that a reasonable person could doubt whether the trial was fair and impartial. With the exception of the first comment set forth above, all of the court's comments that Harris Ranches has identified were made on a single day of a two-week trial. Indeed, except for the first comment, all of the comments were made in the span of eight pages of the reporter's transcript. Moreover, as we have observed already, Alvarez's attorney was the

18

subject of some of the court's criticism.  Under these circumstances, no basis for reversal has been shown.

## VI

### *Denial Of New Trial Motion*

Harris Ranches moved for a new trial, arguing (among other things) that the damages the jury awarded were excessive.  In particular, Harris Ranches argued that Alvarez was solely responsible for his own economic damages, and emotional distress, either because he refused to accept Solari's "repeated[] assur[ances] that he in fact continued to have a job" or because he "refus[ed] . . . to advise anyone on the entire planet [that] he was waiting for an apology from William Harris" before he would go back to work for Harris Ranches.  In support of this argument, Harris Ranches did not offer any legal authority, and it did not provide any citation to the record.[7]

The trial court denied the new trial motion without addressing these arguments expressly.[8]

On appeal, Harris Ranches contends the trial court erred in denying its new trial motion, now framing the excessive damages issue in terms of failure to mitigate

---

[7]    In ruling on Harris Ranches' new trial motion, the trial court noted that while Harris Ranches "ma[de] reference to numerous statements and rulings by the Court, as well as acts allegedly occurring during trial, a complete trial transcript was not provided. On the day oral arguments were heard on this motion . . . , Defendant provided a partial transcript without an index.  No page and line citations were provided by which the Court's attention could be directed to the matters asserted as grounds for a new trial. Although this Court has reviewed the record to the extent possible, the portions relating to the bases for the new trial could not easily be identified."

[8]    On the issue of excessive damages, the trial court noted only that "[t]he amount awarded by the jury [was] within the bounds of reason, representing the difference in what Plaintiff was earning while employed by Defendant, including free housing, and his income from the date of termination to the present in his part-time employment."

19

damages.[9]  Harris Ranches argues that "even if one believed Alvarez when he claimed he was fired, within two hours Alvarez knew he was employed and not fired."  Thus, Harris Ranches contends, "Alvarez had a duty to report to work on August 5, 2009 and had he done so there would have been no economic damages suffered at all."  In the alternative, Harris Ranches argues that because Alvarez said he would have come back to work for Harris Ranches if William Harris had apologized to him, Alvarez "was under a duty to request th[at] apology," and by failing to do so he "failed to take necessary steps to mitigate damages."  Harris Ranches also argues that "[i]f Alvarez remained at work . . . , any small amount of emotional distress damages would have either been greatly reduced or totally eliminated."

Where a defendant attacks a jury verdict on the ground of excessive damages, "[t]he standard of review is well established.  [¶]  The amount of damages is a fact question, committed first to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial.  [Citations.]  All presumptions favor the trial court's ruling, which is entitled to great deference because the trial judge, having been present at trial, necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence rather than our standard of review under the substantial evidence rule.  [Citations.]  [¶]  We must uphold an award of damages whenever possible [citation] and 'can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.'

---

[9]  Harris Ranches also includes a single paragraph referring to four juror declarations filed in support of the new trial motion, in which the four jurors supposedly attested that if they had known Alvarez missed the 2008 harvest because he was incarcerated, "it would have completely changed their vote."  Because Harris fails to provide any citation to the record in support of this assertion, we decline to consider it further.  (See *Utility Consumers' Action Network v. Public Utilities Com.*, *supra*, 187 Cal.App.4th at p. 697.)

20

[Citations.] [¶] In assessing a claim that the jury's award of damages is excessive, we do not reassess the credibility of witnesses or reweigh the evidence. To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor." (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078.)

As for the rule regarding mitigation of damages, it has long been said that "the wrongdoer is not required to compensate the injured party for damages which are avoidable by reasonable effort on the latter's part," but "the question whether an injured party acted reasonably to mitigate damages is a matter to be determined by the trier of fact," "[t]he standard by which the reasonableness of the injured party's efforts is to be measured is not as high as the standard required in other areas of law," and "[i]t is sufficient if he acts reasonably and with due diligence, in good faith." (*Green v. Smith* (1968) 261 Cal.App.2d 392, 396-397.)

Applying the foregoing rules here, we can find no error in the trial court's denial of Harris Ranches' new trial motion. First, with respect to Harris Ranches' argument that "within two hours Alvarez knew he was employed and not fired," that argument is not based on a view of the record that is consistent with our standard of review. The argument is based on Solari's testimony that he told Alvarez that "his job was still open and he could come back to work." Alvarez's son, Juan, testified, however, that what Solari actually said to Alvarez was that William Harris had told Solari, "if you want him back, you hire him." Juan Alvarez further testified, "So I don't know if [telling my father] that was offering [my father] his job back, but it was almost like a challenge to [Solari]. He wasn't telling [my father] you have your job back. He said, Bill, told me if you want him back, you hire him." Juan Alvarez also testified that his father responded to Solari, "you don't sign my check. The one [who] fired me was Bill, not you."

Given the foregoing evidence, which Harris Ranches ignores, there is no basis on which we can interfere with the trial court's ruling denying Harris Ranches' new trial

21

motion or with the jury's award of damages.  Viewing the evidence in the light most favorable to the judgment, the jury could have concluded that what Solari communicated to Alvarez was not actually a bona fide offer by William Harris to continue employing, or to rehire, Alvarez.  Thus, the jury was not bound to find, as Harris contends, that "within two hours Alvarez knew he was employed and not fired," and as a result Alvarez did not fail to mitigate his damages by failing to report for work on August 5, because William Harris had terminated his employment and what Solari told him did not change that.

As for Harris Ranches' second argument, that Alvarez failed to mitigate his damages because he did not make it known that he would have come back to work for Harris Ranches if William Harris had apologized to him, the actual testimony on which that argument is based was as follows:  When asked if he wanted to talk to William Harris when he went to see Solari after the meeting on August 4, Alvarez responded, "No, I did not want to speak with him, but if he had come over and apologized that night or the next day instead of sending all this information with people [who] are not the owners or are in charge, I would have returned to my job if he had spoken with me."  He further testified that he did not tell anyone he would have gone back to work for Harris Ranches if William Harris had apologized until he testified to that effect at his first deposition in July 2012.

Again, viewing the evidence in the light most favorable to the judgment, there is no basis on which we can interfere with the trial court's ruling denying Harris Ranches' new trial motion or with the jury's award of damages.  Based on the evidence recited above, neither the jury, nor the trial court on the new trial motion, was bound to conclude that Alvarez failed to mitigate his damages because he did not promptly tell anyone that he would have come back to work for Harris Ranches if William Harris had apologized to him.  One reason this is so is because Harris Ranches points to no evidence that William Harris *would* have apologized had he learned of Alvarez's desire that he do so. Absent such evidence, the jury was not required to find that Alvarez failed to mitigate his

22

damages by not asking for an apology, and the trial court was not required to grant Harris Ranches a new trial on this basis.

## VII

### *Attorney Fees*

Following the entry of judgment on the verdict, Alvarez filed a motion for prevailing party attorney fees under the FEHA, asking for an award of $581,492.25, which consisted of a lodestar amount of $232,596.90 multiplied by 2.5.[10] In support of the motion, Alvarez did not submit any billing records of the time his attorneys spent on the case. Instead, his primary attorney, Robert J. Wasserman, prepared six charts that were made part of the memorandum of points and authorities in support of the motion. The first chart listed the total amount of hours spent on the case by each of seven attorneys, two paralegals, and one certified law student. The overall total was 862.84 hours, with the vast majority of that time (548.55 hours) attributable to Wasserman. The remaining five charts broke down the time spent into five different time periods, as follows: (1) "Pre-Litigation Hours," July 2010 through January 4, 2011 (12.15 hours); (2) "Pre-Trial Hours," January 7, 2011 through October 26, 2012 (212.39 hours); (3) "Trial Preparation Hours," October 24, 2012 through May 5, 2013 (340.35 hours); (4) "Trial Hours," May 5, 2013 through May 24, 2013 (264.25 hours); and (5) "Post-Trial Hours," May 29, 2013 through June 17, 2013 (32.25 hours). Each chart listed the number of hours each attorney, paralegal, and the certified law student had spent on the case during the time period in question. In addition, each chart contained a brief summary of the services provided during each period, as follows:

---

[10] Alvarez also sought a fee award under Code of Civil Procedure section 2033.420 for proving the truth of various matters that Harris Ranches failed to admit in response to requests for admission, but the trial court did not award fees on that basis and no issue is raised on appeal regarding that aspect of Alvarez's fee motion.

23

(1) "Pre-Litigation Hours": "Attorney hours include meetings and communications with Plaintiff, correspondence with Plaintiff, and government agencies, including the Employment Development Department, legal and factual research on potential causes of action, and drafting the civil complaint. [¶] Paralegal hours include obtaining, compiling, and transmitting client documents." (Italics omitted.)

(2) "Pre-Trial Hours": "Attorney hours include responding to discovery, propounding discovery, meeting and conferring with defense counsel, reviewing discovery responses, drafting memoranda, conducting legal research, arguing discovery motions, communications with witnesses, agencies, and Mr. Alvarez regarding discovery, preparing for depositions, taking depositions, reviewing documents. [¶] Paralegal hours include contacting agencies, preparing discovery responses, reviewing and indexing of documents." (Italics omitted.)

(3) "Trial Preparation Hours": "Attorney hours include reviewing evidence for trial, preparing for examination of witnesses, preparing for voir dire, preparing opening statements, drafting motions in limine, drafting oppositions to motions in limine, correspondence with Plaintiff, drafting notices to appear at trial, preparing jury instructions, drafting trial briefs, drafting statement of the case, drafting witness list, preparing trial exhibits, and conducting legal research. [¶] Paralegal hours include time spent preparing and organizing trial, exhibit and discovery binders for use at trial, as well as transport, assembly, and testing of electronic equipment for use at trial." (Italics omitted.)

(4) "Trial Hours": "Attorney hours include time spent arguing motions in limine, researching opposition to motions in limine, preparing for voir dire, reviewing evidence and preparing for witness examinations, preparing exhibits, preparing jury instructions, and actual time spent at trial. [¶] Paralegal hours include time spent preparing and organizing trial and exhibit binders for use at trial, as well as transport, assembly, and testing of electronic equipment for use at trial." (Italics omitted.)

(5) "Post-Trial Hours":  "Attorney hours include time spent preparing the memorandum of costs, the instant motion, and conducting legal research.  [¶]  Paralegal time spent includes time reviewing and calculating total costs, etc." (Italics omitted.)

In his declaration, Wasserman explained that he had calculated the lodestar amount by multiplying the hours attributable to each attorney, paralegal, and the certified law student by the following hourly rates:  $315 for three attorneys who were shareholders of the law firm, and for himself; $235 for three associate attorneys; and $120 for the paralegals and the certified law student.

In opposition to the fee motion, Harris Ranches argued (among other things) that it was "particularly troublesome . . . that Wasserman does not identify what any of the attorneys did, does not identify what he did, . . . [and] does not distinguish between clerical time, legal research time, if any was necessary, analysis, filing or other activities customarily associated with an attorney."

The court took the fee motion under submission in July 2013, then issued a six-page written ruling on the motion in August.  In its ruling, the court noted the total hours claimed to have been worked on the case but observed that Alvarez did "not include any billing records to show exactly when the hours were worked, the specific tasks being performed, or who performed them.  The figures are simply general summaries of time claimed with no way for the Court to determine if the hours claimed establish a proper 'lodestar' number."  The court went on as follows:  "There is no way to tell, for example, if the drafting of some specific document or pleading took one hour or twenty hours.  This kind of information would bear directly on a determination of whether the time spent was 'reasonable' . . . ."

Despite "[t]he lack of detailed billing records," the court concluded that it could determine a reasonable amount of attorney fees based on "its own evaluation of the reasonable worth of the work done in light of the nature of the case, and the credibility of counsel's declaration," relying on the court's own "33 years' experience in both trying

25

and adjudicating employment discrimination cases in San Joaquin County." The court then proceeded to conclude that the total hours claimed by Alvarez "seems somewhat excessive." The court determined that eight hours per day for the 11 days of trial for "lead trial counsel and co-counsel," who both "were present," amounted to 176 hours, and given "[t]here was only one Plaintiff and one Defendant" and "[t]here was minimal law and motion up to the time of trial," with "no summary judgment motions, demurrers, motions to compel discovery, etc.," "[a]n estimate that preparation for trial would entail approximately twice as many hours as trial seems reasonable." Accordingly, the court determined that 528 hours was a reasonable number of attorney hours, and the court multiplied that amount by a " 'blended' hourly rate" for associate and partners of $275 to get a total of $145,200. The court then found that $120 was a reasonable hourly rate for paralegals and certified law students, and the court multiplied that rate by the 157.7 hours Alvarez had supposedly claimed for the paralegals and the certified law student who worked on his case, for a total of $18,864.[11] Adding the two amounts together, the court came up with a lodestar figure of $164,064.

The court then found that a multiplier of 1.25 was appropriate given the various applicable factors, which led the court to a total fee award of $205,080.

Harris Ranches moved for reconsideration of the fee award, arguing that the court had miscomputed the award based on the erroneous assumption that Alvarez had two attorneys in the courtroom during trial, when in fact he had only one. Harris Ranches proposed reducing the amount of attorney time for trial by half (from 176 to 88 hours)

---

[11]    In fact, the first chart showed a total of only 157.2 hours of work by the paralegals and the certified law student, while the totals from the five time-period charts amount to only 155.7 hours of work. For our purposes, however, these discrepancies are irrelevant, because neither party has raised any issue on appeal regarding the amount of the fee award attributable to work by the paralegals and the certified law student.

26

and reducing the amount of attorney time for trial preparation either by half  (from 352 to 176 hours) or by one quarter (from 352 to 264 hours).

In opposition to the motion, Wasserman admitted Alvarez had only one trial attorney throughout the trial, but Wasserman also submitted his firm's "billing records" for the case for the first time and offered further details about the services reflected on those records.[12]  Alvarez's opposition argued that "to the extent that the Court [wa]s inclined to reconsider its ruling, the award of attorneys' fees should be commensurate with the hours actually worked by Mr. Alvarez's counsel as well as the application of the 1.25 multiplier previously deemed appropriate by the Court."

In ruling on the motion for reconsideration, the trial court agreed with Harris Ranches that the fee award should be reduced to reflect only 88 hours of attorney time spent in trial, resulting in a reduction of $24,200, but the court made no adjustment to the amount of trial preparation time.[13]  The court also deemed the billing records submitted by Wasserman "untimely, since [Alvarez] himself did not ask for reconsideration." Accordingly, the court "decline[d] to re-examine the totality of [Alvarez's] billing and limit[ed] the issue decided . . . to the one raised by the moving party, i.e., whether [Alvarez] was represented by one or two attorneys at trial."  (Underlining omitted.)  The reduction the court ordered resulted in a final fee award of $180,880.

---

[12]     The "billing records" Wasserman submitted consisted of a 27-page "invoice" that was dated the same day Alvarez's opposition to the motion for reconsideration was filed. That document appears to list the actual time slips for the services performed in the case that Alvarez's counsel had previously only summarized in his fee motion.

[13]     In reducing the fee award to reflect the services of only one attorney at trial, the trial court failed to recognize that because of the 1.25 multiplier the court had applied to the original lodestar figure, 88 hours of attorney time was actually worth $30,250 in the original fee award (88 times $275 times 1.25), rather than $24,200 (88 times $275). Harris Ranches did not raise this issue on appeal, however, so we have no occasion to consider whether it amounts to reversible error.

On appeal, Harris Ranches contends the trial court erred in reconsidering the fee award because the court did not make any reduction in the award for time spent in trial preparation consistent with its reduction for time spent in trial based on the fact that Alvarez had only one attorney at trial. In Harris Ranches' view, because "[t]he [trial court's] computations for attorney fees w[ere] . . . tethered to the Court's belief that the trial and preparation for the trial was conducted by two attorneys; when it was established that there was only one attorney," the court erred in "fail[ing] to subtract or even consider the preparation time they allowed for [the] second attorney."

For his part, Alvarez contends in his appeal that the award the court made was inadequate because the court "abused its discretion . . . by refusing to consider the declarations of Alvarez's counsel attesting to hours reasonably spent on the case, based on the erroneous premise that such declarations did not set forth proper proof, and . . . by refusing to consider counsel's contemporaneously created time records."

"The FEHA provides that the trial court, 'in its discretion, may award to the prevailing party reasonable attorney's fees and costs . . . .' (Gov. Code, § 12965, subd. (b).)" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393.) Our Supreme Court "has stated that '[i]n deciding whether to, and how to, award fees under [Government Code] section 12965, subdivision (b), courts will look to the rules set forth in cases interpreting [Code of Civil Procedure] section 1021.5.' [Citation.] Under Code of Civil Procedure section 1021.5, if a court determines that attorney fees should be awarded, computation of those fees is based on the lodestar adjustment method as set forth in *Serrano v. Priest* (1977) 20 Cal.3d 25, [141 Cal.Rptr. 315, 569 P.2d 1303]. [Citation.] Using that method, the trial court first determines a touchstone or lodestar figure based on a careful compilation of the time spent by, and the reasonable hourly compensation for, each attorney, and the resulting dollar amount is then adjusted upward or downward by taking various relevant factors into account. [Citations.] When using the lodestar method to calculate attorney fees under the FEHA,

28

the ultimate goal is 'to determine a "reasonable" attorney fee . . . .' " (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 985.)

Here, no issue has been raised regarding the hourly rates the trial court used, the number of paralegal (and certified law clerk) hours the court found compensable, or the 1.25 multiplier the court applied. Instead, both parties challenge only the trial court's determination that Alvarez's attorneys reasonably spent 440 hours on the case: Harris Ranches contends that number is too high; Alvarez contends it is too low. We find no error.

"[A]bsent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for *all* the hours *reasonably spent* . . . ." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133.) In assessing how many hours were "reasonably spent" on the case, "trial courts must carefully review attorney documentation of hours expended; 'padding' in the form of inefficient or duplicative efforts is not subject to compensation." (*Id.* at p. 1132.) " 'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong" ' -- meaning that [the trial court] abused its discretion." (*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

In assessing whether the trial court abused its discretion in determining the number of hours Alvarez's attorneys reasonably spent on this case, we begin with Alvarez's arguments, because if he is correct that the trial court abused its discretion in rejecting the number of hours his attorneys claimed, we need not reach Harris Ranches' argument that the trial court abused its discretion in the manner in which it employed its alternate approach to determining the reasonable number of hours spent on the case.

Alvarez begins by claiming that the trial court "abused its discretion . . . by refusing to consider the declarations of Alvarez's counsel attesting to hours reasonably spent on the case, based on the erroneous premise that such declarations did not set forth

29

proper proof." According to Alvarez, "[a]lthough the court did not say so explicitly in its ruling, the inference is strong that the court did not believe the declarations set forth credible, admissible evidence which [the court] *could* consider in establishing the lodestar." In Alvarez's view, this amounted to an abuse of discretion because "[w]hen the court performs [the lodestar] calculation under a mistaken impression of the law, there is a failure to exercise proper discretion."

We disagree with Alvarez's interpretation of the court's ruling. First, Alvarez's argument ignores one of the most fundamental rules of appellate law: " 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Under this rule, Alvarez had to *affirmatively show* that the trial court erroneously believed it could not consider the declarations of Alvarez's attorneys in determining the reasonable amount of hours they spent on the case. To make such a showing, Alvarez had to do more than argue a "strong" "inference" that this was so.

Second, and in any event, we disagree with Alvarez that the record supports any such inference, let alone a strong one. As we read the court's ruling, it was not that the court believed it *could not* consider the vague showing made in the declarations of Alvarez's attorneys; instead, the court simply determined that the vague showing Alvarez made was insufficient for the court to properly perform its task of determining the number of hours reasonably spent on the case.

It is true, as Alvarez points out, that in other cases vague showings that were perhaps comparable to the showing made by Alvarez were found sufficient to uphold attorney fee awards on appeal. (E.g., *Weber v. Langholz* (1995) 39 Cal.App.4th 1578, 1586-1587 [attorney declaration attesting that clients incurred $18,075 in attorney fees

for between 90 and 103 hours of work that was "generally summarized" found sufficient to uphold fee award].)  But just because some trial courts have found such vague showings sufficient, and those determinations have been upheld on appeal, does not mean that *every* trial court is bound to find a vague showing sufficient, or that a trial court that finds such a showing *insufficient* must be reversed.  In essentially arguing otherwise, what Alvarez fails to appreciate is that the discretion to determine whether a particular showing is sufficient rests with the trial court, and the proper exercise of that discretion does not require every court to make exactly the same choice.  One judge may find a vague showing sufficient, while another may not.  In each case, however, the determination may well be within the wide range of discretion allowed those courts and thus may not be subject to reversal on appeal.  Only if the court's decision was clearly wrong, thereby amounting to an abuse of discretion, can an appellate court grant relief. (*PLCM Group v. Drexler*, *supra*, 22 Cal.4th at p. 1095.)  Here, however, we do not find any such error.

As we have explained, the showing Alvarez made consisted of:  (1) the total number of hours each attorney, paralegal, and the certified law student spent on the case, then (2) a breakdown of those hours over five different phases of the case (pre-litigation, pre-trial, trial preparation, trial, and post-trial), with a brief description of the services provided during each phase.  As the trial court observed, however, this showing made it impossible for the court (or Harris Ranches' counsel) to determine who performed what task, when they performed those tasks, and how many hours they spent on each task.  As the trial court put it, "There is no way to tell, for example, if the drafting of some specific document or pleading took one hour or twenty hours.  This kind of information would bear directly on a determination of whether the time spent was 'reasonable' . . . ."

As another example, take the work performed during the "Trial Preparation" phase of the case.  According to the showing Alvarez made, five attorneys spent a total of 240.85 hours during that phase of the case, with the bulk of those hours (194.65)

31

attributable to Wasserman. What work was accomplished during that time, who performed it, and how long did it take? Alvarez's showing does not answer any of those questions with any degree of certainty.

First, as to the work that was accomplished, Alvarez offered only that "[a]ttorney hours *include* reviewing evidence for trial, preparing for examination of witnesses, preparing for voir dire, preparing opening statements, drafting motions in limine, drafting oppositions to motions in limine, correspondence with Plaintiff, drafting notices to appear at trial, preparing jury instructions, drafting trial briefs, drafting statement of the case, drafting witness list, preparing trial exhibits, and conducting legal research." (Italics omitted.) Use of the word "include" suggests that the list that follows is not exclusive, but only illustrative. (See *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639 ["The term 'includes' is ordinarily a word of enlargement and not of limitation"].) In other words, *more* work may have been accomplished during the "Trial Preparation" phase of the case than just the specific tasks described in the list provided.

Second, as to who performed the work accomplished (to the extent the work accomplished was described), no answer can be discerned other than that five attorneys performed all of the work and Wasserman performed most of it himself. Beyond that, however, the showing Alvarez made left the court (and opposing counsel) to only guess who performed which tasks.

Third, and perhaps most important, as to how long each task took, Alvarez offered no answer. This appears to have been the crux of the trial court's dissatisfaction with Alvarez's showing, as the trial court's example made clear. ("There is no way to tell, for example, if the drafting of some specific document or pleading took one hour or twenty hours.")

While some other trial court might have found the vague showing made by Alvarez sufficient to support his fee request, notwithstanding all of the problems we have just identified, we cannot say that the trial court here was plainly wrong in finding the

32

showing insufficient. Indeed, even authorities that have upheld a fee award based on a vague showing recognize that "a fee request ordinarily should be documented in great detail." (*Weber v. Langholz, supra*, 39 Cal.App.4th at p. 1587; see also 2 Pearl, Cal. Attorney Fee Awards (3d ed. 2014) § 9.82, p. 9-69 ["A well-documented claim, including time records and a thorough explanation of the exigencies of litigating the case, is extremely valuable in persuading a court to compensate counsel for the hours worked on a matter"].) The showing made here was essentially an extreme form of "block billing," where "a block of time [is assigned] to multiple tasks rather than itemizing the time spent on each task." (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1010.) Case law supports the proposition that the scope of discretion allowed to trial courts in ruling on fee requests permits a trial court to reject block billing in determining the reasonable hours spent on a case. For example, one case explains that while "block billing is not objectionable 'per se,' . . . it certainly does increase the risk that the trial court, in a reasonable exercise of its discretion, will discount a fee request." (*Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 830.) Another case notes that block billing is "a risky choice since the burden of proving entitlement to fees rests on the moving party." (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1325.)

Based on the foregoing, we conclude that Alvarez has shown no abuse of discretion by the trial court in its rejection of the showing Alvarez offered in support of his fee motion of the hours reasonably spent on the case. To the extent Alvarez goes on to complain that the court's alternate approach to determining the reasonable hours spent on the case "was completely untethered from any evidence before him," we offer two responses: First, we disagree, inasmuch as the trial court (1) personally observed the case that was presented; (2) had the benefit of declarations from attorneys on both sides describing, at least in general terms, the work that was (and was not) performed on the case; and (3) was able to evaluate the time needed to adequately prepare and present the

case in light of the court's own "33 years' experience in both trying and adjudicating employment discrimination cases in San Joaquin County." Second, even if we were inclined to agree, it would not benefit Alvarez, inasmuch as we have concluded already that the court did not abuse its discretion in rejecting Alvarez's showing of the hours reasonably spent on the case. In light of that prior determination, if Alvarez were to succeed in showing that the trial court's alternate approach was completely untethered to the evidence, he would do no more than defeat *any* basis for a fee award. Fortunately for Alvarez, however, we conclude that there *was* a sufficient evidentiary basis for the trial court's alternate approach, which allows us to avoid rejecting the fee award altogether -- clearly something Alvarez would like to avoid.

Also, to the extent Alvarez complains the trial court "arbitrarily imputed 8 hours of attorney time for the four days each week . . . the trial was actually in session, under the apparent illusion that for attorneys in trial the work day starts at 8:00 a.m. and ends at 5:00 p.m., after which there is nothing more to do but wait until the next day," we reject that argument also. Essentially, Alvarez assumes that when the trial court determined that 88 hours were reasonably spent by Wasserman during the 11 days of trial between May 7 and May 23, the court awarded fees *only* for eight hours on each of the trial days and awarded no fees for any work performed on each trial day beyond eight hours *and* no fees for any work performed on days during that time period when the court was not in session. But that assumption appears to be based on the approach Alvarez took in requesting a fee award, which was to break the case down into five different periods chronologically, and the record does not compel the conclusion that that is the approach the court took in making its award. Instead, the court appears to have broken the case down into two categories of compensable time: "trial" and "preparation for trial." Alvarez points to nothing in the record to suggest that by "preparation for trial," the court was referring only to time spent *before the trial began*. Thus, the court can be understood to have compensated Alvarez for time his attorneys spent continuing to prepare the case

34

for trial throughout the period the trial was ongoing, from May 7 through May 23, including both time spent by the attorneys on trial days beyond the eight hours the court found compensable under the category of "trial" and time spent on those days during that period when the trial was not in session. Understood in this manner, no abuse of discretion has been shown in the trial court's ruling.

Alvarez's remaining argument is that the trial court abused its discretion when, in ruling on Harris Ranches' motion for reconsideration of the attorney fee award, the court refused to consider the billing records and expanded explanation of services Alvarez's attorney belatedly supplied in opposition to Harris Ranches' motion. We disagree.

Alvarez contends that "[w]hen a motion for reconsideration is made, the court has discretion to consider new evidence from both the moving party and opposing party." Even assuming that this proposition is correct, Alvarez misses the point. The critical question here is not whether the trial court had discretion to consider the billing records and expanded attorney declaration Alvarez submitted in opposition to Harris Ranches' motion for reconsideration; the question is whether, even if the trial court had that discretion, the court *abused* that discretion in *refusing* to consider the evidence belatedly supplied by Alvarez.

Alvarez points to no authority supporting the contention that it was an abuse of discretion for the court to refuse to consider Alvarez's belated evidence. He suggests that once the court decided to reconsider its prior ruling, "the court's discretion to award attorney's fees was again triggered" and thus we must review the trial court's actions as though the court were acting on the attorney fee motion for the first time. Again, however, Alvarez does not cite any authority that supports this argument.

"A motion for reconsideration must be based on new or different facts, circumstances or law [citation], and facts of which the party seeking reconsideration was aware at the time of the original ruling are not 'new or different.' [Citation.] In addition, a party must provide a satisfactory explanation for failing to offer the evidence in the first

35

instance." (*In re Marriage of Herr* (2009) 174 Cal.App.4th 1463, 1468.) There is no reason why these restrictions, which clearly apply to a party who *moves* for reconsideration, should not also apply to a party who *opposes* -- or, more accurately in this case -- *responds* to a motion for reconsideration. Here, Alvarez responded to Harris Ranches' motion for reconsideration by producing new evidence regarding the hours his attorneys spent on the case, without denying that he and his attorneys were aware of that evidence at the time they first moved for a fee award and without explaining why they failed to offer that evidence in support of their original motion. In essence, Alvarez sought a second bite at the apple, trying to use Harris Ranches' motion for reconsideration as a vehicle for making a new, better showing in support of his fee request. The trial court did not abuse its discretion in refusing to allow Alvarez to do this.

That leaves us with one final argument: Harris Ranches' assertion that the trial court erred in reconsidering the fee award because the court did not make any reduction in the award for time spent in trial preparation consistent with the reduction the court made for time spent in trial based on the fact that Alvarez had only one attorney at trial, instead of two as the trial court originally believed. This argument need not detain us long. Harris Ranches' argument rests on the premise that the trial court's "computations for attorney fees was . . . tethered to the Court's belief that the trial *and preparation for the trial* was conducted by two attorneys," when, in fact, "it was established that there was only one attorney." (Italics added.) In other words, Harris Ranches takes the position that not only was there just one attorney at trial for Alvarez, there was also only one attorney who prepared the case for trial. But that is not what the record shows. Alvarez admitted that, contrary to the court's original conclusion in its initial fee ruling, only one attorney represented him at trial. But he made no similar admission regarding

36

preparation for trial.  In fact, Alvarez never retreated from his position that seven different attorneys worked on the case, even though only one (Wasserman) appeared at trial.

Having determined on reconsideration that it overstated the amount of attorney trial hours based on its erroneous belief that two attorneys appeared for Alvarez at trial, the trial court presumably concluded nonetheless that its original determination that 352 hours was reasonable for trial preparation remained appropriate and on that basis chose not to take away any hours for trial preparation.  Harris Ranches has shown no abuse of discretion in that choice, particularly since its underlying factual premise -- that only one attorney prepared the case for trial -- is not supported by any evidence in the record.


DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


/s/_____
Robie, J.

We concur:


/s/_____
Blease, Acting P. J.


/s/_____
Butz, J.